Filed 5/8/15  In re Sofia D. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SOFIA D. , a Person Coming Under the Juvenile Court Law. | B258265 (Los Angeles County Super. Ct. No. DK05377) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant, v. MARIA  D. et al., Defendants; SOFIA D., Appellant. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County.  Annabelle Cortez, Judge.  Reversed and remanded with directions.

Karen B. Stalter, under appointment by the Court of Appeal, for Appellant Sofia D.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Appellant.

No appearance for Defendants.

Sofia D. appeals a jurisdictional finding that she is at substantial risk of serious physical harm.  (Welf. & Inst. Code, § 300, subd. (b)(1).)[1]  The Department of Children and Family Services (DCFS) cross-appeals an order striking allegations that parental medical neglect of an older sibling places Sofia at substantial risk of harm.  (§ 300, subd. (j).)  After reviewing the entire record, we find that there is insufficient evidence to support dependency jurisdiction over Sofia.

## FACTS

Elena D. (born in 1996) and Sofia D. (born in 2002) are daughters of Maria and Romeo D. (Mother and Father).[2]  Elena has diabetes.  In 2012 and 2013, medical providers reported the parents for neglect, because Elena's blood sugar levels were not monitored, placing her at risk of harm.  DCFS deemed the reports unfounded.

In May 2014, Elena was hospitalized with ketoacidosis, a life-threatening condition:  her diabetes was "out of control."  She had been hospitalized four times in two years, twice within the last two weeks.  Her blood glucose level was 445; a normal level is under 100.  Dr. Daniels, an endocrinologist, was concerned that Mother and Father did not check Elena's urine with keto strips, and did not call the doctor to say that they had run out of the strips.  Elena is at risk for neurological damage or death.  Mother and Father were "cooperative," yet Dr. Daniels felt they do not exercise control over Elena, who cannot manage her condition on her own.

Elena admitted that she neglects her medical condition.  She realizes that she should eat a healthy diet and confessed that she "guesses" at her glucose level and the appropriate insulin dosage.  Elena, Sofia and Isabel live with Mother.  Father is supposed to come to their home every morning to watch Elena take her insulin, and Mother is supposed to be in charge the rest of the day.  Isabel helps her at night.  Elena hates poking herself to check her blood, and described herself as stubborn and resistant to parental

---

[1]     All statutory references in this opinion are to the Welfare and Institutions Code.

[2]     Mother and Father are divorced and have joint custody of Sofia.  They are not parties to this appeal, nor is Elena (now an adult) or her adult sister Isabel.

attempts to assist her. She attended a support group when diagnosed with diabetes three years earlier, but stopped attending due to a busy schedule and lack of transportation. Father has diabetes, and discusses the importance of checking blood sugar with her. Elena wanted an insulin pump, but Dr. Daniels said that she is not ready for one because she does not check her blood sugar often enough.

Father acknowledged that Elena was hospitalized twice in May for uncontrolled blood sugar levels. He does his part by visiting Elena every morning to check her insulin, prepare his daughters for the day, and drive them to school. Elena did not accept her diagnosis and told her parents not to worry. Father feels guilty because diabetes runs in his family. He reported that Mother and Elena are in conflict and Elena does not allow Mother to check her blood sugar levels.

Dr. Daniels reported that Elena has "never" been on target with her blood sugar levels. She does not want to use insulin because it makes her gain weight. All of her blood sugar test results were over 100, but the parents did not alert medical providers; in fact, when Dr. Daniels reviewed the results with the family, Mother said to Elena, "you didn't tell me." To see the results, the parents only had to check Elena's meter, but they were not doing so. They delayed in setting up a therapy appointment until they were in the emergency room. Dr. Daniels did not think that Sofia was in danger, just that the parents could not manage Elena. During appointments, Sofia was "very distraught and very worried" and volunteered to check Elena's blood sugar levels.

Sofia seemed parentified. She tries to help by counting Elena's carbohydrate intake and checking her blood sugar. Mother checks the readings sometimes, but is often asleep during the day because her work shift is from 4:00 a.m. to noon. At times, Mother and Elena are not on speaking terms. Sofia denied any physical or sexual abuse and was well-groomed.

Mother reported that the maternal grandmother prepares healthy meals for the family, but Elena does not like the food. Isabel regularly brings Elena unhealthy fast foods. Elena resents when her family checks on her sugar levels, and refuses to show Mother her meter. Mother suffers from high blood pressure and anxiety, so she avoids

undue stress from arguments with Elena, as it worsens her health condition. Elena was experiencing tingling from the uncontrolled diabetes, but still does not accept her condition. Father and Elena are very close, but Father has a girlfriend and visits less often, which his daughters do not like. Mother suggested that Elena was depressed because she receives less attention from Father these days.

A hospital social worker noted that Elena is "very vain" and knows that she can lose weight if her blood sugar levels are high, though this is dangerous. Hospital staff members were concerned that Elena had multiple hospital admissions in one month: it was clear that she is incapable of taking responsibility for her own care. The hospital developed a plan for the family to share responsibility for Elena's blood sugar levels, but there was "no way" the family implemented it, given her current condition. The hospital did everything it could to help, with multiple interventions, meetings and psychological referrals, but the family has not complied, despite knowing that Elena could suffer brain damage or death. The parents impose no consequences for Elena's behavior, at most taking away her cell phone for a day, then returning it to her.

DCFS wanted Father to take custody of Elena upon her release from the hospital, as his diabetes is under control and he understands what needs to be done. Mother was not pleased with this plan. Sofia became very emotional during a team decision meeting, and indicated that she would like to live with the maternal grandmother because Mother and Father bicker, and Mother sleeps and does not cook for them. Mother and Father agreed to set aside their differences and work together for the well-being of their children. Nevertheless, DCFS detained Elena and Sofia because of parental inability to supervise Elena's insulin intake. Court intervention was required to ensure that the parents are able to meet their child's medical needs. DCFS left the children in parental care.

On June 6, 2014, DCFS filed a petition on behalf of Elena and Sofia, alleging that Elena has a medical condition requiring constant supervision of diet, glucose levels, and insulin injections. Father and Mother have failed to monitor the child, resulting in elevated glucose levels and multiple hospitalizations. Parental medical neglect endangers

4

Elena's health and safety, and places Sofia at risk of harm and medical neglect. Mother and Father denied the allegations. The juvenile court found a prima facie case for dependency jurisdiction, released the children to Mother and Father, and ordered a multidisciplinary family assessment.

In the report for the jurisdiction hearing, Elena described her relationship with Mother as "ugly," and herself as "a rebel." She expressed anger at her parents, which is why she "just felt like letting everything go downhill. I didn't understand why they couldn't just put their differences aside." Elena stated, "I think the reason why I was not taking my insulin was to get back at them." She felt pride at her body weight, and acknowledged using less insulin to lose weight. Initially, she did not feel sick; however, "after that second hospitalization I got some sense knocked into me. Dr. Daniels said I could have put myself into a coma, and be brain dead." She is communicating better with Mother, is "daddy's little girl," and benefits from talking to a psychologist about family matters. Things are different now because she is scared.

Sofia stated that Elena must check her blood sugar morning and night. Father comes over twice a day, but he "never really helped with Elena checking her blood sugar." He would eat and shower. Their grandmother helps cook and clean while Mother sleeps. The parents argue and scream; Elena jumps in and argues with both of them. Sofia does not participate in arguments; she just wants to help Elena. Every 30 minutes, she reminds Elena to take medication, but Elena is stubborn. Father "used to ask Elena about her insulin. Not so much now. Not even when Elena was younger. They didn't really ask her about her sugars. Mostly Elena has been on her own about checking her blood sugar," although Isabel and their grandmother help.

Mother stated that Elena has had Type I diabetes for three years. The family was referred to a specialist who ordered lab work, but they did not complete it. After Elena became ill and had flu-like symptoms, Mother took Elena to complete the lab work, and was called by a pediatrician, who said that Elena's blood sugar was extremely elevated, over 500. Mother expects Elena to make good eating choices, measure her blood sugar regularly, and take the appropriate amount of insulin. Elena was hospitalized twice in

May. After her first hospitalization, Elena complained of symptoms, but Mother could not find a keto strip, so they went to the hospital again. Both times, the physician explained that Elena could die. Mother feels that Elena is responsible "since the beginning" for taking care of her diabetes. Mother blamed Father's interest in a new girlfriend for Elena's failure to regulate her blood sugar levels.

Father stated that Elena was diagnosed with diabetes when he and Mother were divorcing. He noticed that Elena was losing weight and drinking a lot of water. She was hospitalized at the age of 13. Elena must take insulin every time she eats. Father has a different type of diabetes. Elena does not want to admit that she has diabetes, and does not allow Mother to check her blood sugar.

Dr. Daniels requested strongly that "DCFS be involved throughout the year" because Elena was not taking insulin and "[i]t's not going to end well. She is either going to die or have brain damage. She is a danger to herself." Elena has poor control of her condition because she worries about getting fat. She lacks family support, and was upset by the parents' disputatious behavior. Dr. Daniels believed that "Elena's lack of attention to her insulin levels [is] deliberate due to the amount of stress she is experiencing at home." The parents cannot keep her safe. Elena now has a "sensor" to help her check her blood sugar levels. The hospital social worker stated that as of July 2014, Elena's blood sugar levels were better, though not optimal.

In its assessment, DCFS wrote that the children are very aware of hostility and distrust between the parents, and are caught in the middle of parental disputes. Elena admittedly uses her medical condition to take "control." Sofia felt responsible for Elena's medical care, including food intake and insulin injections, and could not rely on the parents, who were argumentative and unhelpful. The grandmother was largely responsible for cooking, cleaning, caring for and raising the children.

The jurisdiction hearing was conducted on July 29, 2014. Counsel for Sofia and Elena asked the court to sustain the allegation that the parents failed to protect Elena: back-to-back hospitalizations endangered Elena's health and demonstrated a lack of parental supervision. The family requires DCFS involvement to help Elena comply with

6

her medical needs. Minors' counsel said, "I do believe the Court should take jurisdiction and supervise this family," owing to family tension and dynamics, adding that "this is a very serious situation, where failure to address this properly . . . could have led to brain damage or death, potentially." Minors' counsel asked the court to strike Sofia from the petition as there is no basis for asserting jurisdiction over her. Mother and Father asked the court to dismiss the petition because the evidence shows that Elena refuses to take insulin and deliberately created this predicament.

DCFS asked the court to sustain the allegations as to both children. Mother and Father failed to act the first time Elena nearly died and allowed her to nearly die a second time. She is their responsibility, even at 17 years of age. If Elena refuses to check her blood sugar or take insulin, then the parents must act. Sofia is at risk because Mother and Father nearly allowed Elena to die from medical neglect. The parents have demonstrated for years that they are not able to appropriately supervise a sick child in their home and ensure the child's safety. Though they promised to monitor Elena since 2012, they have not done so. This risk extends to Sofia if she were to get diabetes or another illness. The parents' marital woes prevent them from taking care of their children, and caused Sofia to become the family caretaker in their stead, at the age of 11.

The court sustained the allegation that Mother and Father failed to protect Elena, and their conduct places Sofia at risk of physical harm and medical neglect, but it struck the abuse of sibling allegation. (§ 300, subds. (b), (j).) It declared the children dependents of the court. The children were released to parental custody, under DCFS supervision. The court ordered individual and conjoint counseling to address case issues and co-parenting. Sofia appeals. DCFS cross-appeals from the court's decision to strike the abuse of sibling count.

## DISCUSSION

### Sofia's Appeal

Sofia challenges the order declaring her a dependent of the court. We review jurisdictional findings to see "'if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from

the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.""'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The elements of a "failure to protect" count consist of (1) neglectful parental conduct; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)[3] Though the courts afford special protection to children of tender years who face an inherent risk to their physical health and safety in the absence of adequate supervision and care, this does *not* extend to older children who can avoid the danger of neglectful parents by seeking out responsible adults. (*Id.* at p. 824-825; *In re Drake M.* (2012) 211 Cal.App.4th 754, 767; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004 [11-year-old child could avoid the dangers that make infancy hazardous].)

Evidence of past conduct may be used to establish dependency jurisdiction, to the extent that it is probative of current conditions. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1438; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.) "[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.)

The courts need not wait until a child suffers a medical disaster before intervening. For example, if a young child has a life-threatening cancer that was treated with surgery, chemotherapy and radiation—but there is a 25 percent chance of recurrence and the parents refuse to allow medical monitoring for religious reasons—the court may assert

---

[3]     A child is subject to the jurisdiction of the juvenile court if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or parent [ ] to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).)

continuing jurisdiction over the child to prevent possible future harm. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1004-1006.)

Trial counsel conceded that Mother and Father failed to protect Elena by monitoring her blood sugar levels: she deteriorated to the point that she was hospitalized multiple times with a life-threatening condition. (See *In re R.T.* (2015) 235 Cal.App.4th 795 [parental inability to supervise or protect a rebellious teen warrants dependency jurisdiction].) Mother had a poor attitude toward rectifying the problem, feeling that Elena was responsible for monitoring her diabetes. The record demonstrates that Elena had (in her words) an "ugly" relationship with Mother, who sought to avoid conflict with her child due her own high blood pressure and anxiety. Elena admitted not taking insulin "to get back at" her parents and to lose weight. She refused to allow Mother to check her blood sugar levels or look at her monitor. Throughout, Sofia sought to assist Elena in monitoring her blood sugar, food consumption, and insulin dosage.

The record does not support a finding that parental failure to confront and overcome Elena's admittedly recalcitrant and rebellious stance creates a substantial risk of serious harm to Sofia, who appears to be the most sensible member of the family. There is no evidence that Sofia currently suffers from diabetes or other serious illness. Mother and Father have never refused life-saving medical treatment for Sofia, unlike the parents in *In re Eric B.* In emergencies, they hospitalized Elena.

There was no proof at the time of the hearing that Sofia faced a defined risk of harm. (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) Instead, there was only a theoretical risk of uncertain future harm. At trial, DCFS contended that "*[i]f* Sofia was to get diabetes or *if* Sofia would get sick, these parents would continue, as they have in the past . . . to allow their marital problems . . . [to] result in not taking care of Sofia." (Italics added.) The agency's argument is conjecture and mere speculation, which is not a basis for finding a substantial risk of harm. (*In re Savannah M.*, *supra*, 131 Cal.App.4th at p. 1394.) "[S]peculation about the mother's possible future conduct is not even sufficient to support a finding of dependency much less removal of the physical custody of the child from the parent." (*In re Steve W.* (1990) 217 Cal.App.3d 10, 22.) Sofia's adamant

and oft-expressed concerns about the mortal danger of diabetes—and her expertise in its treatment—render untenable any argument that medical neglect will occur if Sofia were to fall ill.

The legislative purpose of the dependency laws "is to provide maximum safety and protection for children who are *currently* being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are risk of that harm." (§ 300.2, italics added.) Parental neglect posed a danger to Elena's immediate safety at the outset of this proceeding. No one challenges that finding. By contrast, there is no evidence that Sofia is currently neglected, and any future risk of harm is theoretical.

DCFS argued below that jurisdiction was appropriate because "Sofia is parentified." Jurisdiction cannot be asserted solely due to fears of emotional harm, under subdivision (b) of section 300. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 718.) There is simply no evidence that Sofia faced "a *substantial* risk of *serious* physical harm or illness" at the time of the jurisdiction hearing. (§ 300, subd. (b)(1), italics added.)

### Cross-Appeal of DCFS

DCFS contends that the court should have sustained allegations of sibling abuse. This provision has two prongs: (1) the child's sibling has been abused or neglected, and (2) there is a substantial risk that the child will be abused or neglected. (§ 300, subd. (j); *In re Ricardo L.*, *supra*, 109 Cal.App.4th at p. 566.) There must be a probability that a given harm will occur, and consideration afforded to the severity of the sibling abuse. (*In re I.J.*, *supra*, 56 Cal.4th at p. 778 [serious, prolonged sexual abuse of a sibling supports a finding of risk].)

The first prong was satisfied: as trial counsel conceded, Elena was medically neglected. The problem, once again, is the lack of evidence of a *substantial risk* that Sofia will be generally neglected, medically neglected or abused, so as to warrant jurisdiction under section 300. As the juvenile court found at the hearing, Sofia and Elena are "differently situated," so that Elena's specific situation and unsupervised medical needs do not pose a similar risk to Sofia.

10

## DISPOSITION

The order declaring Sofia D. a dependent of the court is reversed. The matter is remanded with directions to (1) vacate the finding that Sofia is at substantial risk of serious physical harm or illness; (2) vacate the order declaring Sofia a dependent of the juvenile court; and (3) dismiss the petition as to Sofia.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

11